## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| | ) CRIMINAL NO. 3:2007-5 |
| v. | ) |
| | ) |
| | ) |
| TYRONE D. WILLIAMS, | ) |
| | ) JUDGE GIBSON |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION and ORDER OF COURT

**GIBSON, J.**

This matter comes before the Court on the Defendant Tyrone D. Williams' (hereinafter "Defendant") Motion to Suppress Evidence with Citation of Authority (Document No. 31). The Defendant was indicted for unlawful possession of a firearm by a convicted felon in violation of 18 U.S.C. §§ 922(g)(1) and 924(e)(1). This Court possesses subject matter jurisdiction of these alleged offenses pursuant to 18 U.S.C. § 3231. Venue is proper in this judicial district in accordance with Federal Rule of Criminal Procedure 18.

The Court conducted an evidentiary hearing on December 19, 2007 and a second evidentiary hearing on February 1, 2008. The Court directed the parties to file proposed findings of fact and conclusions of law based upon the transcript of the evidentiary proceedings. Post-hearing briefing began with the Defendant's Proposed Findings of Fact and Conclusions of Law with Citation of Authority (Document No. 82) (hereinafter "Def. Brief") and was completed by the parties with the filing of the Government's Proposed Findings of Fact and Conclusions of Law (Document No. 87)

(hereinafter "Gov't Brief") on July 15, 2008. The federal public defender on behalf of the Defendant filed a late reply brief (Document No. 86) without leave of court on August 14, 2008. It will be stricken and not considered by the Court as no leave to file this document late was obtained in accordance with the Court's Practices and Procedures.

For the reasons stated herein, the Defendant's Motion to Suppress Evidence will be granted in part and denied in part.

The testimony from the several witnesses in this matter cannot be entirely credited by the Court because of the express conflicts among the recollections of the witnesses. Between the discrepancies of the testimony, lack of knowledge of certain facts, the passage of time, and the medications taken by one witness and the possibility of her being influenced in her testimony by fear of retaliation, credibility was essential to the following findings. Therefore, the Court offers that the following facts have been assembled with credibility given in part to certain portions of the testimony of each witness, with none of them being entirely knowledgeable, cognizant or otherwise recalling all of the events of the evening of August 14, 2005.

## FINDINGS OF FACT

1.  On August 14, 2005, Patrolman[1] Scott Haymaker (hereinafter "Haymaker")was working as a patrolman and answered a call that reported a "domestic assault" at approximately 8:05 p.m. Hearing Transcript of December 19, 2007 (Document No. 66)(hereinafter "HT1"), pp. 3-5.

2.  Haymaker has been the affiant on approximately 25 to 50 search warrants while working for the Johnstown Police Department; he has also participated in execution of the same amount of search warrants when he was not the affiant. HT1, p. 4.

---

[1]Scott Haymaker has now been assigned the position of detective with the Johnstown Police Department.

2

3. In response to Erica Paul's (hereinafter "Paul") call to 911, Haymaker, dressed in uniform, proceeded to the address of 202 Hickory Street, Johnstown, Pennsylvania in a "marked [patrol] vehicle"; Patrolman Carothers (hereinafter 'Carothers") also arrived on the scene in uniform in a marked police vehicle. HT1, pp. 5-6, 88-89; Government Exhibit 1.

4. Patrolman Keim (hereinafter "Keim"), in uniform and driving a marked vehicle, arrived after Haymaker and Carothers. HT1, p. 104.

5. Paul reported to 911 and to Carothers, Keim and Haymaker that the Defendant assaulted her and that he remained in the house, while Paul remained outside of the house. HT1, pp. 6, 89; Government Exhibit 1.

6. Paul while speaking with the police officers was "in a body cast from her waist to her neck area, and she indicated she was in a previous car accident and she was wearing a cast because she had 12 broken ribs"; Paul was prescribed and was taking various pain medications at this time including percocet, fentanyl patches and oxycontin. HT1, p. 6; Hearing Transcript of February 1, 2008 (hereinafter "HT2"), pp. 8-9, 16.

7. Paul was crying and appeared to be in pain according to Haymaker's observations; Paul indicated that "in an [altercation] over a T-shirt" the Defendant "began to slam her against the walls in the house". HT1, p. 7.

8. Paul refused medical treatment, but requested that the Defendant be arrested. HT1, pp. 7, 40-41, 60, 90, 95.

9. Paul did not have the keys to the house, all of its doors were locked and the Defendant was inside the home. HT1, pp. 6, 96.

10. Paul indicated to the three police officers on the scene that she and the Defendant had "a large, very aggressive Pit Bull inside the house"; the officers surrounded the house and the officers at the front and back doors knocked and all three announced their presence and identity as Johnstown Police Officers with the third officer standing to the side of the house; the home was a "duplex" with a second home within the other half of the structure. HT1, pp. 8-12; Government Exhibit 2-6.

11. The police officers yelled to the Defendant inside that they were not leaving and that they would enter the home to arrest him if he did not "surrender". HT1, pp. 13, 90.

3

12. After continual knocking and announcing "for a few minutes" with no response and the pit bull barking, Paul's twelve year old daughter, Tila[2] Madden (hereinafter "Madden"), arrived on the scene[3] and she agreed to secure the dog after one of the police officers would breach the back door so that the police officers could enter the home and arrest the Defendant. HT1, pp. 13, 90.

13. Madden in response to questioning by Carothers indicated that the Defendant possessed a firearm and that the firearm was similar in size to Carothers' "department-issued weapon" "a 40 caliber Beretta" as opposed to a long rifle. HT1, pp. 91-93, 98-99.[4]

14. Paul indicated that there were no firearms within the home, but the Defendant had "an electronic stun gun, a taser type gun." HT1, pp. 109-110, 117-118[5]

15. Paul did not have any keys to the home, did not want to involve her landlord and did not give consent to Haymaker, Carothers and Keim to enter the home to arrest the Defendant and obtain the taser gun inside. HT1, pp. 44, 96, 105; *compare* HT1, pp. 110, 117-118 with Defendant's Exhibit 1[6], pp. 5, 7-8; HT2, pp. 10-11.

---

[2]"Tila" is spelled "Teela" in the Government Exhibits 8 and 9 and Defendant's Exhibit 1.

[3]It is concluded by implication from the record that Madden did not live at 202 Hickory.

[4]The parties make much of the fact that Carothers did or did not contradict himself with regard to the location of the weapon on Defendant's person in 202 Hickory. The Government criticizes the wording of the cross-examination on this point, Govt's Brief, pp. 3-6. The discrepancy is immaterial in light of the circumstances at the time: the Defendant was in 202 Hickory and whether a firearm was in the house or the Defendant possessed the firearm while he was in 202 Hickory, the firearm was in 202 Hickory. The Court sees no basis for the Defendant's argument that there was a "deliberate falsehood" or statements made with "reckless disregard for the truth" on this matter and therefore no basis to hold a hearing pursuant to *Franks v. Delaware*, 438 U.S. 154, 171-172, 98 S.Ct. 2674, 2685-2686, 57 L.Ed.2d 667, 682 (1978) even in spite of the Defendant's failure to request such a hearing or otherwise request exclusion of evidence based upon such allegations in his Motion to Suppress Evidence.

[5]Although Haymaker indicated twice in his questioning that he inquired as to the presence of firearms within the home after the Defendant was in custody, but before the police officers accompanied Paul into the home, see HT1, pp. 17, 19-20, 55-56, the Court is crediting Keim in this paragraph because his recollection of the sequence of events is more consistent. Keim notes the awareness of a firearm from Madden's comment before original entry into the house and also the questioning of Paul regarding the presence of a firearm prior to the original entry into the house. The Court finds it more credible to believe Keim's recollection because it would appear to be consistent with the police officers' concern for their safety that they would confirm with an actual tenant of the house whether a firearm was inside prior to their entry rather than waiting until after their entry into 202 Hickory and arrest of the Defendant. *See* Haymaker's statements at HT1, pp. 15-16.

[6]Defendant's Exhibit 1 was admitted into evidence by the Court for the purpose of displaying any inconsistencies between the exhibit and the testimony of only those officers who testified at the suppression hearing. As for the Government's hearsay objection to the police report, and the subsequent discussion in court regarding the applicability of

4

16. On the issue of consent, Haymaker described the nature of Paul's "consent":

> Q. Okay. Now, Erica never agreed to having the door kicked in, correct?
> A. No. She was, she was there the entire time we discussed this plan.
> Q. Right. My question wasn't was she present, my question was she never agreed to that, did she?
> A. To tell you the truth, I don't, I don't know if she agreed. But she certainly didn't disagree.

HT1, p. 44.

17. Madden's first attempt succeeded, in controlling the pit bull after the back door was forced open, but she ran away before the police could enter screaming "I see him" and the back door was closed again. HT1, pp. 16, 50.

18. A second attempt by Carothers to enter the back door and control the pit bull failed as the dog came onto the back porch, was then controlled by the Defendant who lead him back into the home and shut the back door; the Defendant did not respond to the police officers' calls to come out of the home. HT1, pp. 16, 50-51, 91, 99-101.

19. The police officers again knocked and announced their presence, the pit bull came out onto the front enclosed porch area in "agitated" manner, the police officers drew their weapons for their own safety, but the Defendant controlled the dog, began to re-enter the home and refused the police officers' requests to surrender saying that he would not come out when their guns are drawn. HT1, pp. 17-18, 51-52.

20. In response, the police officers indicated to the Defendant that their firearms were drawn to protect against the dog only and requested that he "secure the dog and come out and be taken into custody." HT1, pp. 18, 52.

21. A final attempt to enter the home by Haymaker was successful as Haymaker took the Defendant into custody while also observing the marijuana in the living room and indicated thereafter to the other police officers that an "Act 64" violation occurred. HT1, pp. 19, 102, 120, 123; *compare* HT1, pp. 124-125 with Defendant's Exhibit 1.

---

the hearsay rule in a suppression hearing, hearsay evidence is admissible in a suppression hearing: "At a suppression hearing, the court may rely on hearsay and other evidence, even though that evidence would not be admissible at trial." *United States v. Raddatz* 447 U.S. 667, 679, 100 S.Ct. 2406, 2414, 65 L.Ed.2d 424,435 (1980)(citations omitted); *United States v. Hubbard,* 269 F.Supp.2d 474, 479 (D.Del. 2003)(citing *Raddatz).*

22.  Once in custody, the Defendant was placed in a police cruiser and was "[e]xtremely agitated" making statements to Paul telling her that she should refuse any police request to search the home and making references to "Moses"an alias of the Defendant's brother William Gene Gulley. HT1, pp. 19, 93.

23.  The Defendant refused consent to search the house. HT1, p. 112.

24.  Paul was then asked by one of the police officers if she or the Defendant was a convicted felon, and Paul indicated that they both were. HT1, p. 20.

25.  Paul indicated to police that she wanted to enter the home to retrieve baby food and diapers for her young child, but the Haymaker would not permit Paul to enter the home to retrieve these items unless she surrendered the stun gun to the police:

    A.    ...Her options would have been–she had two options. One was to grant us consent to go inside the house with her and voluntarily turn over the stun gun. Or the second option would have been we stop where we're at, we apply for a search warrant, and we go in and get the stun gun. That was her two options, and that's the way we explained it to her. We're not here to search your house.

                                                            ***

    Q.    So, in a nutshell, you told her you can go in only if you allow us to accompany you?
    A.    Only if she willingly turns over the stun gun, correct.

    HT1, pp. 63-64; *see also* pp. 21-22.

26.  Haymaker did not want Paul going into the residence without an escort because he believed the stun gun to be evidence of a crime as he believed neither Paul nor the Defendant could possess it in light of their felony convictions. HT1, p. 63.

27.  However, the police officers told Paul that they must accompany her inside the home while she retrieved the necessities she sought for her baby and surrendered the stun gun to the police officers; Paul's response was "okay" to the first proposition of being escorted into the residence and surrendering the stun gun to the police officers. HT1, pp. 21-22, 63.

28.  Prior to entering the house with Haymaker and Keim, Paul's daughter, Madden entered the home, removed the pit bull and chained it outside; thereafter Paul, Madden, Keim and Haymaker entered the home in that order. HT1, pp. 22-23, 58, 112.

29. Upon entering the home, the first room the four entered was the living room, in which on the "glass coffee table [was] a plastic baggie containing what appeared to be marijuana." HT1, pp. 23-24, 64; Government's Exhibit 7.

30. Haymaker then pointed out the presence of the suspected marijuana to Paul, to which she responded "that's not mine" and Haymaker then requested consent to search the home from Paul "for narcotics, evidence of domestic disturbance, and the electronic stun device", but Paul refused citing the fact that the Defendant would seek retribution if she gave consent to search. HT1, pp. 25, 68-69, 113, 122.

31. Keim then went with Paul to obtain the stun gun and Paul also gathered her baby's belongings; Haymaker took possession of the marijuana as evidence, went back outside; while outside Haymaker observed the Defendant "inside the police car just out of control" and requested his consent to search the home, but the Defendant also denied consent to search the home. HT1, pp. 25-26, 58, 69, 122.

32. The Defendant subsequently vomited on the floor of the police car; the Defendant also communicated that he had previous heart problems. HT1, pp. 26, 70, 93-94.

33. As a result of the vomiting and possible heart problems, an ambulance was called for the Defendant, he was transported to Conemaugh Hospital accompanied by a police car as he had been placed "under arrest for domestic disturbance." HT1, pp. 26, 70.

34. After the Defendant was taken to the hospital, he escaped from police custody after being separated from the accompanying officer. HT1, p. 26.

35. Meanwhile, after Keim obtained possession of the stun gun and Paul had obtained what she wanted from the home, Keim exhibited the stun gun to Madden asking her if this was the gun she referred to earlier, and in a reluctant manner she told Keim to search the Defendant's bedroom; everyone left the home and Haymaker had the home secured by other police officers and applied for a search warrant because Paul and the Defendant refused consent to search and Paul was aware that an application for a search warrant would be made in the absence of her consent. HT1, pp. 25, 27, 71, 113-115, 126, 127.

36. The search warrant was obtained to search for "[e]vidence of domestic violence to include: photographs of the scene, blood, hair, trace evidence, evidence of breakage; Taser/stun gun or similar weapon; any firearms or other prohibited offensive weapons; Proof of residency; Controlled substances and paraphernalia for ingestion and/or distribution of controlled substances; Cellular phones and their digital contents to include call detail information, phone numbers, digital photographs, text messages, GPS data; Owe sheets, financial records, books and ledgers, financial wire transfer receipts;

7

Photographs and video tapes depicting criminal activity." Government Exhibit 8, HT1, pp. 27-29.

37.   Haymaker returned to the Johnstown Public Safety Building to prepare the search warrant application and affidavit of probable cause, which was later reviewed and approved by assistant district attorney Don Gerred and thereafter approved and issued by Judge Krumenacker of the Cambria County Court of Common Pleas. HT1, pp. 30-31.

38.   In the process of preparing the search warrant, Haymaker did a criminal history background investigation which revealed both the Defendant and Paul were convicted of felonies, but only the Defendant's criminal convictions and arrests were enumerated in the affidavit of probable cause: "A review of the criminal history of Tyrone Williams indicates that he has a conviction for delivery / PWID on December 11, 1998; Forgery on November 6, 1999; He has been arrested for Burglary, Criminal Possession of a Weapon, Assault, robbery, and many other offenses." HT1, pp. 32; Government Exhibit 8, p. 6.

39.   Haymaker then returned to 202 Hickory, executed the search warrant (Government Exhibit 8) and "found additional marijuana roaches, some marijuana seeds, lots of drug paraphernalia, plastic baggies with the corners removed, large amounts of plastic baggies, some chit and owe sheets, ammunition, and...a gray colored safe in the master bedroom underneath the crib." HT1, pp. 31-32.

40.   The safe was recovered from 202 Hickory, but the safe was not opened at the advice of Don Gerred, who was present during execution of the search warrant; Don Gerred suggested that a second search warrant be applied for and obtained before the safe could be opened. HT1, p. 32.

41.   Haymaker then prepared a second application for a search warrant based upon the same information as the first warrant with some changes and additions (date of violation, and description of "Safes, strong boxes and their contents; Ammunition (spent and live); All correspondence between Willie Gene Gulley, Jr., and Tyrone Williams."); it was approved by Don Gerred and then approved and issued by Judge Krumenacker. HT1, pp. 33-34; Government Exhibit 9.

42.   The second search warrant (Government Exhibit 9) was executed by Haymaker and Detectives Owens and Robertson "[i]n the parking garage of the Public Safety Building"; the contents of the safe included a loaded firearm, correspondence, "two notebooks that contain chit and owe sheets", "a digital scale with residue on it", and marijuana. HT1, pp. 35-36.

8

## CONCLUSIONS OF LAW

1. The Fourth Amendment to the United States Constitution reads: "The right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. CONST. amend. IV.

2. "Probable cause exists when 'there is a fair probability that contraband or evidence of a crime will be found in a particular place.' *Illinois v. Gates*, 462 U.S. 213, 238, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983)." *U.S. v. Grubbs*, 547 U.S. 90, 95, 126 S.Ct. 1494, 1499, 164 L.Ed.2d 195, 203 (2006).

3. "It is a 'basic principle of Fourth Amendment law' that searches and seizures inside a home without a warrant are presumptively unreasonable." *Payton v. New York*, 445 U.S. 573, 586-587, 100 S.Ct. 1371, 1380, 63 L.Ed.2d 639, 651 (1980).

4. "In terms that apply equally to seizures of property and to seizures of persons, the Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant." *Payton v. New York*, 445 U.S. 573, 590, 100 S.Ct. 1371, 1382, 63 L.Ed.2d 639, 653 (1980); *see also United States v. Coles*, 437 F.3d 361, 365-366 (3d Cir. 2006)("Warrantless searches and seizures inside someone's home (or in this case, a hotel room) are presumptively unreasonable unless the occupants consent or probable cause and exigent circumstances exist to justify the intrusion." (citations omitted)).

5. Examples of exigent circumstances include, but are not limited to, hot pursuit of a suspected felon, the possibility that evidence may be removed or destroyed, and danger to the lives of officers or others. In these limited situations, the need for effective law enforcement trumps the right of privacy and the requirement of a search warrant, thereby excusing an otherwise unconstitutional intrusion. Exigent circumstances, however, do not meet Fourth Amendment standards if the government deliberately creates them.

   *U.S. v. Coles*, 437 F.3d 361, 366 (3d Cir. 2006).

6. It is clear from the record that there was no outstanding arrest warrant for the Defendant or an outstanding search warrant for the residence at 202 Hickory at the time in question.

9

7.    Furthermore, no exigent circumstance existed in the case *sub judice* upon which entry of the residence could occur in the absence of a warrant:

A) there was no hot pursuit of the Defendant as he had already locked himself inside at 202 Hickory by the time officers arrived; the Defendant was within his home, alone, with his dog, which, although agitated, the Defendant prevented from going outside of the house after Carothers breached the door;

B) 1) the victim of the domestic assault, Paul, was outside without food and diapers for her baby, but not in fear for her safety from the Defendant and the three police officers on the scene had 202 Hickory surrounded without the possibility that the Defendant would leave;

2) it was confirmed by Paul that there was a stun gun in the home, and the police were present because of the domestic assault, not because of the use or threatened use of the stun gun, thus there was no exigent circumstance as there was no known or stated concern for the stun gun's destruction or removal from the premises by the Defendant in an attempt to destroy evidence;

3) Madden presented conflicting reports from her mother, Paul, regarding the presence of a firearm within the residence, but the Court credits the testimony of Paul and the fact that the police officers believed Paul with respect to the absence of a firearm: no firearm was reported discharged, no firearm was brandished by or threatened to be used by the Defendant during the evening in question, Paul actually lived with the Defendant in the home and indicated there was no firearm in the home[7] as opposed to Madden who lived elsewhere, and the only known concern for the safety of the police officers and bystanders was the Defendant's pit bull kept inside the home; additionally if there was a concern that a firearm was possessed or would have been used by the Defendant, Carothers would have drawn his firearm rather than his *stun* gun when he breached the rear door and confronted the pit bull and the Defendant as well as the fact that the Court cannot conceive that the three officers would permit the juvenile, Madden, to approach the home to secure the pit bull after the door was breached if there was any reasonable possibility that she would be shot or taken hostage by an armed Defendant.

---

[7]At this point in the evening, Paul had not offered any indication that the Defendant might retaliate against her should she reveal incriminating evidence against him. It was only later when the Defendant was in custody that Paul entered the house to obtain her baby's necessities and Haymaker sought her consent to search 202 Hickory that she indicated that the Defendant would retaliate against her should she cooperate and permit a search of the premises. Therefore, her earlier statement at the time prior to Haymaker's entry into the premises that there wasno firearm within 202 Hickory could not be discredited by her fear of retaliation.

C) the Defendant was holding no hostages and not making any demands upon the police officers, except to ask them not to shoot the pit bull; the Defendant made no known threatening movements or demands of the police officers.[8]

8.    Alternatively, assuming the police possessed probable cause to arrest the Defendant, if this Court were to find the presence of an exigent circumstance, the exigency was the creation of the police officers as their knocking, announcing their presence and requesting the Defendant emerge from the premises possibly alerted the Defendant for the need to destroy or remove evidence or place the police on the defensive thus creating an exigent circumstance that was not present prior to their actions; after arriving at the residence the police need only have removed escorted Paul to a place where she could have provided statements in support of an arrest warrant while two other officers remained to ensure the Defendant did not escape-knocking on the doors and windows and agitating the pit bull inside as well as presenting the Defendant with an ultimatum to come out of the home or we (the police) are coming in does not present the required exigent circumstance. *United States v. Coles*, 437 F.3d 361, 367-371 (3d Cir. 2006).

9.    The findings of fact of this Court also present no basis to conclude that Paul, as a resident of 202 Hickory stated that the police had consent to enter the home: Paul indicated that she wanted the Defendant arrested, but she did not have the keys to the premises, would not let the police officers contact the landlord to obtain spare keys, and Keim indicated in his report made the day after the incident, August 15, 2005, that "Paul was not sure what she wanted to do" which contradicts his testimony given in December 19, 2007 in which he stated that she gave the police officers consent to breach the door; at most Paul stood silent in response to the police officers' request for consent to enter and thus no consent was given.[9]

10.   The Government offers that the Fourth Circuit case of *United States v. Hylton*, 349 F.3d 781 (4th Cir. 2003) permits this Court to conclude that Paul granted implied consent to

---

[8]Based upon this finding, the Court finds that the Government's citation to *United States v. Wadley*, Crim No. 2:07-166, 2007 WL 4593508 at *5, 2007 U.S.Dist.LEXIS 94999 at *16-18 n. 9 (W.D.Pa. Dec. 28, 2007) is distinguishable. *Wadley's* finding of an exigent circumstance concerned the presence of the couple *within* the residence and a report of a "possible hostage situation" and "domestic violence" (footnote nine addresses circumstances where concern for the safety of another is present). *Id.* at *5-6. In the case *sub judice* there was no hostage taken and the victim was prevented from being near the Defendant because he excluded her from their residence.

[9]Although the Court finds that Haymaker saw the marijuana during his initial entry into the home to arrest the Defendant, he did not seize it and was not conducting a search for controlled substances at that time. Thus, it is only his second entry into 202 Hickory, when he accompanied Madden and Paul and physically seized the baggie of marijuana, that presents an issue under the Fourth Amendment and the exclusionary rule. Discussion of that seizure is set forth later in this memorandum opinion rather than at this juncture.

the police officers to enter 202 Hickory because she called 911 requesting the police to arrest the Defendant for simple assault, but the Government confuses the facts and issues between *Hylton* and the case *sub judice*.

11. The consent discussed in *Hylton* was consent to search *after* the arrest of Hylton outside of the home following his voluntary exit of the home; the police then searched the home for the firearm his girlfriend alleged was inside. *Hylton* at 783-786.

12. However, the Government frames *Hylton* incorrectly when it argues: "In the case at bar, the circumstances, along with Ms. Paul's words and conduct, likewise lead to the conclusion that she gave officers implied consent to enter the residence she shared with Mr. Williams for the purpose of arresting him." Govt.'s Brief, p. 17.

13. The *Hylton* court found that:

> valid consent may be given by any one of the co-habitants of a premises, even though no other co-habitant has consented. This principle follows from the rationale that co-habitants have joint access or control for most purposes and therefore have the right to permit the inspection as their own right-each co-inhabitant has "assumed the risk that one of their number might permit the common area to be searched." *United States v. Matlock*, 415 U.S. 164, 171 n. 7, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974).

*U.S. v. Hylton*, 349 F.3d 781, 785 (4th Cir. 2003); this analysis does not appear to have survived the Supreme Court's ruling in *Georgia v. Randolph* and its distinguishing of the *Matlock* precedent:

> Since the co-tenant wishing to open the door to a third party has no recognized authority in law or social practice to prevail over a present and objecting co-tenant, his disputed invitation, without more, gives a police officer no better claim to reasonableness in entering than the officer would have in the absence of any consent at all.

\*\*\*

> There are two loose ends, the first being the explanation given in *Matlock* for the constitutional sufficiency of a co-tenant's consent to enter and search: it "rests ... on mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right ...." 415 U.S., at 171, n. 7, 94

12

S.Ct. 988. If *Matlock' s* co-tenant is giving permission "in his own right," how can his "own right" be eliminated by another tenant's objection? The answer appears in the very footnote from which the quoted statement is taken: the "right" to admit the police to which *Matlock* refers is not an enduring and enforceable ownership right as understood by the private law of property, but is instead the authority recognized by customary social usage as having a substantial bearing on Fourth Amendment reasonableness in specific circumstances. Thus, to ask whether the consenting tenant has the right to admit the police when a physically present fellow tenant objects is not to question whether some property right may be divested by the mere objection of another. It is, rather, the question whether customary social understanding accords the consenting tenant authority powerful enough to prevail over the co-tenant's objection. The *Matlock* Court did not purport to answer this question, a point made clear by another statement (which the dissent does not quote): the Court described the co-tenant's consent as good against "the absent, nonconsenting resident." *Id.,* at 170, 94 S.Ct. 988.

*Georgia v. Randolph,* 547 U.S. 103, 114-115, 120-121, 126 S.Ct. 1515, 1523, 1527, 164 L.Ed.2d. 208, 222, 226 (2006).

14.  In addition to the legal basis for the consent found in *Hylton* having been overturned, *Hylton* is further distinguishable on the facts: the complaining co-tentant in Hylton remarked to police that Hylton locked her out of the residence, Hylton had a firearm in the house, he used the firearm in previously raping her, two of her children may be in the residence, police officers entered the residence and performed "a protective sweep" after Hylton voluntarily exited the residence and was arrested outside of the home based upon three outstanding arrest warrants (for minor traffic violations) while no facts indicated that Hylton objected to the search, *Hylton* at 783-784 as compared to Paul in the instant case who indicated she was locked out, only the Defendant was inside with access to a stun gun and she needed to obtain necessities for her baby but she was not permitted to go inside the home until after the Defendant's arrest (subsequent to a breach of the front door) and then only upon the condition that she surrendered the stun gun.

15.  Contrary to the Government's reading of *Hylton,* both *Hylton* and *Randolph* address consent to search a residence for evidence of a crime, not to arrest, but for Fourth Amendment purposes that distinction is of no import as will be discussed shortly; the important distinction between *Hylton* and *Randolph* is the existence of an objection to the entry into the residence from a present co-tenant as no objection was voiced in *Hylton* but one was voiced in *Randolph.*

13

The Fourth Circuit in *Hylton* concluded its Fourth Amendment analysis as follows:

> "In sum, we conclude that the undisputed facts in this case support the inference that Harper gave consent to the Prince George's County police to enter her apartment and to retrieve the firearm about which she complained. And because we have found implied consent, we need not address the alternative theories applied by the district court to justify the warrantless search...."

16.    Although *Hylton* and *Randolph* both address consent to enter and search a residence, *Hylton* provides no basis to conclude that the Fourth Amendment permits entry into a residence by police officers (as in the case *sub judice*) upon the request of a co-tenant excluded from the residence in order to effect an arrest of a co-tenant inside the residence who refuses entry to the police officers; Hylton initially refused to answer police telephone calls to him in the home for forty minutes, but then answered the telephone and thereafter walked out of the home surrendering himself for arrest and entry into the home occurred after the arrest, *Hylton* at 784, whereas the Defendant in the case *sub judice* never voluntarily opened his door to Haymaker.

17.    As for the *Randolph* decision, the Government offers two bases to distinguish it from the case *sub judice*: first, and quite ineffectually, the Government in footnote 4 of its proposed findings of fact offers that the Defendant "never denied consent for the officers to enter the residence to arrest him." Document No. 85 n. 4, but the Defendant kept the doors locked, did not answer requests from the police to come out of the house and surrender and was ultimately arrested inside of 202 Hickory after forcible entry by Haymaker–such circumstances clearly establish that the Defendant impliedly denied consent to the police to enter 202 Hickory.

14

18. Second, the Government offers that *Randolph* concerned consent to enter and search a residence whereas the case *sub judice* concerned consent to enter and arrest; despite the fact that *Hylton* addressed only consent to enter and search, this distinction is of no moment as the Fourth Amendment requires a warrant for either entry into a home to arrest someone inside the home or entry into a home to search it absent valid consent to enter the home or the combination of probable cause and an exigent circumstances with neither scenario being present here.[10]

19. Justice Stevens writing for the majority in *Payton v. New York* almost thirty years ago recognized the equal applicability of the Fourth Amendment to matters of the search of a home and the arrest of a person within his home:

> But the critical point is that any differences in the intrusiveness of entries to search and entries to arrest are merely ones of degree rather than kind. The two intrusions share this fundamental characteristic: the breach of the entrance to an individual's home. The Fourth Amendment protects the individual's privacy in a variety of settings. In none is the

---

[10]The Government's argument reads "Randolph is further distinguishable in that it dealt with consent to search a residence. Here, the initial entry of the officers was to arrest Mr. Williams, not to search." Govt's Brief, p. 19 n. 4. This argument treads on unstable ground in light of existing Supreme Court precedent. The case *sub judice* presented a scenario that was quite simplified, a Defendant within his own home—entry into the home could occur either through an arrest warrant, *see Payton, supra* the Defendant's consent to police officers' entry, or the presence of probable cause and exigent circumstances, *see United States v. Coles*, 437 F.3d 361, 365-366 (3d Cir.2006). The Government is assuming that Paul validly granted the police consent under the Fourth Amendment to enter and arrest the Defendant in their shared home. As already discussed, this is incompatible with the precedent in *Randolph* and such a distinction would furthermore create a schism in Fourth Amendment law that would place consent to enter a residence and arrest a suspect on different grounds from consent to enter and search. This would be contrary to the equal applicability of the Fourth Amendment to seizures of property and person within the home discussed in *Payton*. *See* COL 4. At risk of stating the obvious, it would also create yet another exception that police officers would not only have to learn and conform to but also recognize when the situation presents itself.

Consider also the Government's attempted distinction between consent to enter and search a residence versus consent to enter and arrest an individual, in a scenario where two co-tenants live in a residence in which a non-resident suspect has come to avoid apprehension by police officers and one co-tenant permits a police officer, who possesses only an arrest warrant, to conduct a warrantless search of the residence for the suspect while the second co-tenant objects to the search. *Steagald v. United States* 451 U.S. 204, 205-206, 101 S.Ct. 1642, 1644, 68 L.Ed.2d 38, 41 (1981) teaches that entry into a third party's residence to arrest a suspect requires both a search warrant for the residence and an arrest warrant for the suspect. Considering a scenario in which a police officer is armed with only an arrest warrant for a suspect, but not a search warrant for a third party residence shared by two co-tenants and the residence in which the police officer believes the suspect to be present in, the Government would have the Court distinguish between consent to enter and search versus consent to enter and arrest. Thus, the Government would appear to read *Steagald* as presenting no impediment to a search of the two co-tenants' residence because it is an entry made to effectuate an arrest, not search for evidence. To follow this logic would be clearly contrary to *Steagald*. Additionally, if one co-tenant objects to the other co-tenant's consent to the police officer to enter and search for the suspect pursuant to an arrest warrant only, that police officer's entry would violate the Fourth Amendment as understood through *Steagald* and *Randolph*.

15

zone of privacy more clearly defined than when bounded by the unambiguous physical dimensions of an individual's home-a zone that finds its roots in clear and specific constitutional terms: "The right of the people to be secure in their . . . houses . . . shall not be violated." That language unequivocally establishes the proposition that "[a]t the very core [of the Fourth Amendment] stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion." Silverman v. United States, 365 U.S. 505, 511, 81 S.Ct. 679, 683, 5 L.Ed.2d 734. In terms that apply equally to seizures of property and to seizures of persons, the Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant.

*Payton v. New York*, 445 U.S. 573, 589-590, 100 S.Ct. 1371, 1381-1382, 63 L.Ed.2d 639, 652-653(1980).

20.    In the context of consent to search, the Supreme Court in *Randolph* continued to recognize the operation of the warrant requirement when co-tenants present conflicting indications of their consent to search:

> Disputed permission is thus no match for this central value of the Fourth Amendment, and the State's other countervailing claims do not add up to outweigh it.[5]
>
> > [5]A generalized interest in expedient law enforcement cannot, without more, justify a warrantless search. *See Mincey, supra*, at 393, 98 S.Ct. 2408 ("[T]he privacy of a person's home and property may not be totally sacrificed in the name of maximum simplicity in enforcement of the criminal law"); *Coolidge v . New Hampshire*, 403 U.S. 443, 481, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971) ("The warrant requirement ... is not an inconvenience to be somehow 'weighed' against the claims of police efficiency").

*Georgia v. Randolph* 547 U.S. 103, 115-116, 126 S.Ct. 1515, 1524, 164 L.Ed.2d 208, 223 (2006).

21.    As the Supreme Court has settled the issue of consent to enter and search given by one co-tenant over the objection of a present co-tenant, this Court similarly finds that the objection of one co-tenant can override the consent of another co-tenant with regard to

permission granted to a police officer to enter a residence and arrest the co-tenant.

22.   Even in consideration of the fact that consent to enter 202 Hickory and arrest the Defendant was given by Paul either expressly or impliedly, the Defendant's express or implied objection to Paul's consent would nullify Paul's consent based on the logic of *Randolph* and the Fourth Amendment to consent to enter and *arrest*; a contrary reading of the Fourth Amendment that would allow police officers, without a warrant and/or who possess probable cause but no exigent circumstances to enter a residence to arrest a co-tenant objecting to their entry upon the consent of another co-tenant and would work against the understanding of the Fourth Amendment as interpreted in *Payton* and *Randolph*.[11]

23.   Turning to Paul's entry into 202 Hickory and the surrender of the stun gun, it has been recognized that the voluntary surrender of evidence to the police by a co-tenant of a residence does not present a violation of the Fourth Amendment's prohibition against unreasonable search and seizures. *See Georgia v. Randolph*, 547 U.S. 103, 116, 126 S.Ct. 1515, 1524, 164 L.Ed.2d 208, 223 (2006) (citing *Coolidge v. New Hampshire*, 403 U.S. 443, 487-490, 91.S.Ct. 2022, 2048-2050, 29 L.Ed.2d 564, 595-596 (1971)); *see also United States v. Coleman*, 628 F.2d 961, 966 (6th Cir. 1980).

---

[11]The Court recognizes that *Randolph* was a situation of two present co-tenants, one granting consent to search and the other denying it that was distinguished from consent to search granted by only one tenant who was present as observed in *Matlock*. However, unique to the situation with respect to consent to enter a residence and arrest one of its inhabitants, it is recognized that issues concerning consent to enter a residence and *arrest* someone inside, whether through the suspect personally opening his door to the police officer or a suspect's co-tenant, standing inside or outside of the residence and attempting to grant consent to enter to arrest, the suspect will always be present inside the home. Therefore, because arrest requires seizure of the person, there is no scenario analogous to a co-tenant permitting entry into a residence to *search* in the absence of another co-tenant which exists in a Fourth Amendment arrest issue.

It is also recognized that the presence of both co-tenants in the home, for instance the consenting co-tenant at the threshold speaking with police officers, the objecting co-tenant yelling his objections from a second story window (for fear of presenting himself at the door to police officers and being arrested) could present a scenario where a valid objection exists denying the police officers from validly entering the home. However, other circumstances may be present such as threats by the objector or fears voiced by the consenting co-tenant that may present exigent circumstances which coupled with probable cause obviate any need for the police officers to heed the objections of the other co-tenant. *See Randolph*, 547 U.S. at 117, 126 S.Ct. 1515, 1525, 164 L.Ed.2d 208, 224 n. 6 (2006)("Sometimes, of course, the very exchange of information like this in front of the objecting inhabitant may render consent irrelevant by creating an exigency that justifies immediate action on the police's part"). Fortunately, such a complicated scenario is not present here as it is clear from the facts that if one would recognize Paul as having provided consent (express or implied) to enter and arrest the Defendant, the Defendant's actions in not responding or opening the door to the police officers demonstrated his implied objection to any consent to enter the home and arrest him.

24. However, the search of a residence over the objection of present and non-consenting co-resident is impermissible under the Fourth Amendment. *Randolph*, 547 U.S. 103, 113-115, 126 S.Ct. 1515, 1522-1524, 164 L.Ed.2d. 208, 221-222.

25. In the absence of consent to the police entry, the questions presented in the case *sub judice* are whether the officer's entry into 202 Hickory was a search, if so was it conducted in violation of the Fourth Amendment; and second, if not a search, how should the surrender of the stun gun and the entry into 202 Hickory Street be characterized?

26. It has been noted that a search under the Fourth Amendment occurs when an individual possesses "a subjective expectation of privacy that society recognizes as reasonable" *Kyllo v. United States*, 533 U.S. 27, 33, 121 S.Ct. 2038, 2042, 150 L.Ed.2d 94, 101 (2001)(citation omitted).

27. This Court concludes that Paul's actions in finding the stun gun and turning it over to the police as a condition to her being permitted into her residence was in fact a governmental search, not a private search, in violation of the Fourth Amendment.

28. Whether a private party should be deemed an agent or instrument of the Government for Fourth Amendment purposes necessarily turns on the degree of the Government's participation in the private party's activities, *cf. Lustig v. United States*, 338 U.S. 74, 78-79, 69 S.Ct. 1372, 1373-1374, 93 L.Ed. 1819 (1949) (plurality opinion); *Byars v. United States*, 273 U.S. 28, 32-33, 47 S.Ct. 248, 249-250, 71 L.Ed. 520 (1927), a question that can only be resolved "in light of all the circumstances," *Coolidge v. New Hampshire, supra*, 403 U.S., at 487, 91 S.Ct., at 2026.

*Skinner v. Railway Labor Executives' Ass'n*, 489 U.S. 602, 614-615, 109 S.Ct. 1402, 1411-1412, 103 L.Ed.2d 639, 658 (1989).

29. The record is unequivocal that the Defendant himself was present, and denied consent to search 202 Hickory.

30. Thereafter police presented Paul with a choice: you can obtain your child's necessities while also providing us with the stun gun you admitted was inside the home or you will not be allowed in 202 Hickory, it will be secured while a search warrant is obtained and you will have to wait until the search warrant is obtained and executed upon the house

18

and we obtain the stun gun pursuant to a search warrant before you may enter again.[12]

31.       When a prosecutor seeks to rely upon consent to justify the lawfulness of a search, he has the burden of proving that the consent was, in fact, freely and voluntarily given. This burden cannot be discharged by showing no more than acquiescence to a claim of lawful authority. A search conducted in reliance upon a warrant cannot later be justified on the basis of consent if it turns out that the warrant was invalid. The result can be no different when it turns out that the State does not even attempt to rely upon the validity of the warrant, or fails to show that there was, in fact, any warrant at all.

*Bumper v. North Carolina*, 391 U.S. 543, 548-550, 88 S.Ct. 1788, 1792, 20 L.Ed.2d 797, 802-803 (1968)(footnotes omitted).

32.     Paul permitted the police to escort her inside so that she could obtain her child's necessities and in exchange for Paul's entry the police were given possession of the stun gun located within the home after Paul located it and handed it to Keim.

33.     Paul presented no indication that she would have surrendered the stun gun if she would not have needed to enter 202 Hickory for her child's necessities.

34.     Haymaker made a claim of lawful authority that he could obtain a warrant and seize the stun gun without Paul's assistance.

35.     The police officers expressed their exercise of control over 202 Hickory to Paul when they presented her with her two options as to when and how she could enter that residence.

36.     At the time the police officers presented the two options to Paul, they did not possess a warrant and no exigent circumstance was present that would permit their search of 202 Hickory; at that point the extent of permissible police action was the ability to prevent

---

[12]Indeed, the Government confirms the offer of this "choice" in its Brief : "It is clear, given the testimony of the officers, that had Ms. Paul not agreed to allow them to accompany her into the residence, the officers would not have allowed her to enter the residence. The fact that she did enter the residence is indicative that she agreed to allow the officers to accompany her into the residence to retrieve the stun gun." The Government in its footnote six also addresses the pain medication and overall competence of Paul to consent to the police officers request. The Court believes Paul to have been mentally competent when making her decision on this matter, but the police officers' "carrot and stick" approach to entering 202 Hickory with Paul's alleged consent conditioned on her required cooperation and affirmative assistance in exchange for her child's necessities as discussed in the following conclusions of law is clearly improper and vitiates any consent as consent was present, if at all, only in form and not in substance.

19

Paul or anyone else from destroying any evidence present within 202 Hickory. *See Illinois v. McArthur, infra.*[13]

37.  Being unable to seize the stun gun as evidence without a search warrant, the police conditioned Paul's entry into 202 Hickory to obtain necessities for her baby upon her surrendering the stun gun.

38.  Paul acted as an instrument of the police in locating and surrendering the stun gun to the police in acting to perform a task they were not permitted to perform legally and a task for which there was no indication that she would otherwise have voluntarily completed in the absence of her need to enter to obtain unrelated articles.

39.  Thus, Paul's actions in conducting a search for the police over the objection of the Defendant must result in the exclusion of the evidence uncovered, namely the stun gun.

40.  Alternatively, if the Court did not view the police's escorting of Paul into 202 Hickory as a *search*, it would be considered a *seizure* like that analyzed in *McArthur*, but the question in that characterization is whether the seizure was unreasonable.

41.  "A 'seizure' of property occurs when there is some meaningful interference with an individual's possessory interests in that property"

    *U.S. v. Jacobsen*, 466 U.S. 109, 113, 104 S.Ct. 1652, 1656, 80 L.Ed.2d 85, 94 (1984)(footnote omitted).

42.  Alternatively, the Court finds that the police escort of Paul into 202 Hickory was a seizure of the residence, the seizure was unreasonable and for that conclusion the Court rests upon the application of the *McArthur* analysis set forth below as the constraint exercised by police was more than a mere escort, but an entry conditioned upon searching for and surrendering evidence

43.  The Government cites *Segura v. United States*, 468 U.S. 796, 104 S.Ct. 3380, 82 L.Ed.2d 599 (1984) as one of its cases in support of the police officers' actions in

---

[13]The Government's citation to *Segura v. United States*, 468 U.S. 796 (1984) for the proposition that the police officers in the case *sub judice* were permitted to enter and secure the stun gun presents an incomplete reading of *Segura*; *Segura*'s holding was conditioned upon the police officers securing evidence *while a search warrant was sought, see Segura* at 810 104 S.Ct. 3380, 3388 ("We hold, therefore, that securing a dwelling, on the basis of probable cause, to prevent the destruction or removal of evidence while a search warrant is being sought is not itself an unreasonable seizure of either the dwelling or its contents."), but there was no search warrant sought for the evidence to be secured in the case *sub judice, i.e.* the stun gun, only an entry of a co-tenant to 202 Hickory conditioned on surrender or the stun gun. The holding in *Segura* is discussed further, *infra*.

following Paul into the home to allow her to obtain the baby's belongings and hand over possession of the stun gun to police.

44. In *Segura*, then Chief Justice Burger outlined his reasoning and conclusion that when probable cause exists, police actions in "securing a dwelling...to prevent the destruction or removal of evidence while a search warrant is being sought is not itself an unreasonable seizure of either the dwelling or its contents." *Segura*, 468 U.S. at 810, 104 S.Ct. 3380, 3388, 82 L.Ed.2d 599, 612; however this conclusion was in part IV of the Court's opinion wherein only Justice O'Connor agreed with the Chief Justice.

45. *Segura*'s majority holding rested upon the application of the independent source doctrine and the independent source of the information contained in the later obtained warrant. *Segura*, 468 U.S. at 813-814, 104 S.Ct. 3380, 3390, 82 L.Ed.2d 599, 614-615.

46. However, in the similar but more recent case of *Illinois v. McArthur*, 531 U.S. 326, 329-333, 121 S.Ct. 946, 948-951, 148 L.Ed.2d 838, 846-849 (2001), a police officer restricted a husband's access to his trailer home after his wife had removed her belongings and told the police that her husband had "dope" present in the house, the Supreme Court balanced the interests of law enforcement versus a citizen's privacy under the Fourth Amendment.

47. While awaiting the arrival of a search warrant (a period of time amounting to less than two hours), the assistant chief of police remained at the trailer and only permitted the husband in the home to make telephone calls and obtain his cigarettes by escorting him. *McArthur*, 531 U.S. 326, 329, 121 S.Ct. 946, 949, 148 L.Ed.2d 838, 846 (2001).

48. The Supreme Court in *McArthur* in balancing the interests of law enforcement and the homeowner found the assistant chief's actions in escorting the husband into the trailer to be reasonable under the Fourth Amendment because probable cause existed to believe the trailer "contained evidence of a crime," the police officer had reason to believe the evidence would be destroyed if McArthur was left unescorted, the police officer presented a reasonable alternative to searching the home by escorting McArthur into his home without searching the home itself thereby not conducting a search but also ensuring the police interest in preserving evidence and finally, that this "restraint" was of a limited time period. *McArthur*, 531 U.S. 326, 331-333, 121 S.Ct. 946, 950-951, 148 L.Ed.2d 838, 848-849.

49. Applying *McArthur*'s balancing test to the facts *sub judice*, there are similarities and differences between the two scenarios: the similarities are that both cases arise from domestic disputes, the police had probable cause to believe that evidence of a crime was within the dwelling based upon the admission of an inhabitant of the dwelling and

21

consent to search the dwelling was not given by either of the co-habitants; the differences are that the suspect in *McArthur* was not under arrest and was permitted to enter the dwelling under supervision of the police, the Defendant in the case *sub judice* was under arrest and thereafter it was Paul, the victim, who was permitted to enter the residence under police supervision.

50.     One additional and pivotal fact that differentiates the case *sub judice* and *McArthur* is that Paul in the instant case agreed to turn over the evidence of a crime in exchange for being permitted by law enforcement to enter and retrieve articles for her baby; in *McArthur* no one volunteered the evidence that was the subject of the later search warrant.

51.     The Court finds that in applying the balancing of "privacy-related and law enforcement-related concerns" set forth in *McArthur*, 531 U.S. 326, 331-332, 121 S.Ct. 946, 950, 148 L.Ed.2d 838, 848, Haymaker's actions in following Paul into the home while she collected belongings for her baby in exchange for her surrender of the stun gun was an unreasonable seizure of the home at 202 Hickory under the Fourth Amendment: 1) no probable cause existed to believe that evidence of a crime existed in the home based upon Paul's own admission of the presence of the stun gun and that she and the Defendant were convicted felons because being a felon is not the predicate fact prohibiting possession of firearms under 18 Pa.C.S.A. § 6105, *see United States v. Jones,* Criminal Number 3:2007-21, 2008 WL 3926549 (W.D.Pa. August 27, 2008); 2) despite the Defendant being in custody and the lack of probable cause, Paul herself was subject to possible later prosecution for being in possession of the stun gun and to allow her to enter the home unsupervised could permit her to remove, secret or destroy the stun gun; 3) although Paul lived at the home, she was not placed under arrest and her decision to permit the police officers into the home was based upon two options presented by the police officers, with both options requiring surrender of the stun gun to the police officers; 4) Paul agreed to turn over the stun gun to the police when the police accompanied her into the home in exchange for Paul being permitted to obtain articles for her baby from inside the home; 5) the police never presented Paul with the option of obtaining the articles for her baby with a police escort and not surrendering the stun gun.

52.     In the most simplistic terms, the seizure was unreasonable because its conditions invaded the privacy to an extent greater than necessary to fulfill the law enforcement goals of preserving evidence.

53.     Therefore, whether the police's entry into 202 Hickory with Paul is considered a search or a seizure, it is was unreasonable under and contrary to the Fourth Amendment.

22

54.  The plain view doctrine also does not present a basis for the warrantless seizure of the marijuana and the stun gun.

55.  Regardless of whether the officers were present in 202 Hickory as a search and/or seizure, their presence was not permitted under the Fourth Amendment because of the absence of voluntary consent of Paul and the police's unreasonable conditioning of Paul's entry into her own home upon her locating and surrendering the stun gun.

56.  Had Haymaker been inside 202 Hickory in accordance with the Fourth Amendment, the plain view doctrine would have permitted Haymaker to seize the marijuana he viewed within 202 Hickory upon his entry when accompanying Paul.

57.  The Third Circuit has summarized the requirements of the plain view doctrine as follows:

> The Supreme Court has allowed officers to seize incriminating evidence in plain view during the course of a lawful search because such a seizure "does not involve an intrusion on privacy. If the interest in privacy has been invaded, the violation must have occurred before the object came into plain view." *Horton v. California*, 496 U.S. 128, 141, 110 S.Ct. 2301, 2310, 110 L.Ed.2d 112 (1990). In *Horton*, the Supreme Court set forth three requirements for valid seizures of evidence in plain view. First, the officer must not have violated the Fourth Amendment in "arriving at the place from which the evidence could be plainly viewed." *Id.* at 136, 110 S.Ct. at 2308. Second, the incriminating character of the evidence must be "immediately apparent." *Id.* Third, the officer must have "a lawful right of access to the object itself." *Id.*

*United States v. Menon*, 24 F.3d 550, 559 (3d Cir. 1994).

58.  Based upon the fact that Haymaker and Keim were inside 202 Hickory pursuant to a search because of Paul's involuntary consent (obtained after denial of consent from a present and objecting co-tentant) and/or an unreasonable seizure under the Fourth Amendment, they have not satisfied the first requirement of complying with the Fourth Amendment in being present to see evidence in plain view.[14]

59.  As a result, pursuant to the exclusionary rule, the evidence of the stun gun and the marijuana seized during this entry must be excluded as a basis for the first search

---

[14]With the failure to fulfill the first condition of the plain view doctrine, the Court does not address the potential deficiencies in fulfilling the remaining two requirements.

warrant (Government Exhibit 8) obtained by the police. *United States v. Herrold*, 962 F.2d 1131, 1137-1138 (3d Cir. 1992).

60. Turning to the substance of the two search warrants at Government Exhibits 8 and 9, the Court must now review these warrants without consideration of the tainted evidence, (*i.e.* the stun gun and the marijuana).

61. A review of the first warrant at Government Exhibit 8, excluding consideration of the marijuana discovered as noted in paragraph 10 and the "'Panther' electronic contact stun gun" obtained by police as noted in paragraph 11, reveals that this warrant presents only evidence in support of the fact that a firearm is present, but that evidence does not amount to probable cause for a firearms crime.

62. The Defendant contests that the information provided by Tila Madden regarding a "short" firearm in the residence as essentially unreliable because she did not reside at 202 Hickory and her mother, Paul who did reside at 202 Hickory denied the presence of a firearm by indicating that only a stun gun was in the residence.

63. While the Defendant protests Haymaker's reliance upon Madden's statement in the affidavit of probable cause characterizing her as an informer without explaining the basis of her knowledge, *see* Def. Brief, pp. 29-30, LaFave in his authoritative work has recognized the difference between informers who originate from the "criminal milieu" and "citizen-informer" and the Supreme Court's inconsistency when addressing these two groups. LaFave, *Search and Seizure, A Treatise on the Fourth Amendment* § 3.3 (4th ed. 2004); using LaFave's dichotomy of criminal and non-criminal informers this Court would clearly characterize Madden as non-criminal.

64. Nevertheless, the distinction does not result in a difference of analysis here: the Defendant offers his analysis under *Gates* and the Third Circuit precedent in *United States v. Williams*, 3 F.3d 69, 72-73 (3d Cir. 1993) relied upon *Gates* in evaluating a similar situation of an "informer" (believed to be a motel employee) who observed activity supportive of a finding of probable cause.

65. Since the Third Circuit has applied *Gates* to instances of "informers" who do not live within criminal circles, the Court finds it appropriate to do so for the information provided by Madden.

66. Both affidavits of probable cause establish that Madden arrived after the police were already on scene; it was never stated or implicated that Madden lived at 202 Hickory, but she did offer her assistance in obtaining control of the pit bull inside, thus indicating her familiarity with the dog and logically establishing her familiarity with the home and

24

its residents.

67. Madden also offered to enter 202 Hickory with police after a breach of the door and control the dog despite having indicated that the Defendant possessed a firearm, which could indicate a belief that the Defendant would not use a firearm against her.

68. However, the police permitted Madden to attempt to control the dog after a breach of the door despite their fear that the Defendant possessed a firearm, which reflects a limited concern on their part as to at least the use of a firearm by the Defendant, if not also limited concern regarding the presence of a firearm.

69. Among the other relevant information in Government Exhibit 8 is that Paul, one of the two residents of 202 Hickory, stated that the Defendant did not have any firearms.

70. Also Paul and the Defendant were admitted by Paul to be convicted felons, which in conjunction with the admission regarding the stun gun potentially placed both the Defendant and Paul at risk of criminal liability, something that an individual would not typically admit to the police.

71. Considering the totality of these circumstances pursuant to *Illinois v. Gates*, 462 U.S. 213, 230-232, 103 S.Ct. 2317, 2328-2329, 76 L.Ed.2d 527, 543-544 (1983), the Court concludes that there is a lack of substantial basis to conclude that the information in the affidavit of probable cause establishes probable cause to believe a firearm was present at 202 Hickory as a non-resident reported the presence of the firearm, but Paul, a resident reported the presence of a stun gun the possession of which by her may have been illegal.

72. Additionally, the Defendant has challenged the search warrant at Government Exhibit 8 as being without probable cause to search for the stun gun because the search warrant itself indicated "that they only had a stun gun" and that Paul already surrendered "a 'Panther' electronic" stun gun to the police. Government Exhibit 8, p. 6.(emphasis added).

73. Although this Court has already determined that the stun gun itself may not be used at trial or considered in this search warrant because it is tainted, to ignore the fact that the stun gun was surrendered would produce an absurd result in reviewing the affidavit of probable cause because it would permit this Court to view the unexcised portions of the search warrant at Government Exhibit 8 as presenting probable cause to search for a stun gun that was already in police possession.

25

74. Therefore, on this limited issue, because the exclusionary rule as interpreted in *Wong Sun v. United States,* 371 U.S. 471, 484-486, 83 S.Ct. 407, 416, 9 L.Ed.2d 441, 453-454 (1963) is intended to deter police misconduct and should the Court exclude consideration of paragraph 11 of the affidavit of probable cause at Government Exhibit 8, the police's violation of the Fourth Amendment would benefit the Government on this issue, the Court will consider the fact that the stun gun was obtained as stated in paragraph 11 in order to properly permit consideration of the fact that the police sought to search for an item they had already possessed.

75. *Wong Sun* found the "fruits of official illegality", *id.* prohibited the use of the tainted evidence in order to deter police misconduct, but because its application in this instance would result in a benefit to the Government from the violation of the Fourth Amendment, the Court cannot overlook the fact that the police possessed a stun gun surrendered by Paul, indicated that fact within the affidavit of probable cause and still sought the issuance of a search warrant that sought "Taser / stun gun or similar weapon".

76. Therefore, the Court finds that the search warrant at Government Exhibit 8 is overbroad as to a "Taser / stun gun or similar weapon" as it fails to establish probable cause for that item inasmuch as the police had previously taken possession of it and this reference to "Taser / stun gun or similar weapon" is redacted from the warrant. *See U.S. v. Ninety-Two Thousand Four Hundred Twenty-Two Dollars and Fifty-Seven Cents ($92,422.57),* 307 F.3d 137, 149 (3d Cir. 2002).

77. Next, the Court considers the allegations set forth in paragraph 12 of the affidavit of probable cause which state: "A review of the criminal history of Tyrone Williams indicates that he has a conviction for delivery / PWID on December 11, 1998; Forgery on November 6, 1999; He has been arrested for Burglary, Criminal Possession of a Weapon, Assault, robbery, and many other offenses."

78. The search warrant granted permission to search for "Taser / stun gun or similar weapon; Any firearms or other prohibited offensive weapons" and while it indicated a violation of "18 Pa.C.S. § 908.1 Use or possession of electronic incapacitation device" it did not list as a violation 18 Pa.C.S. § 6105 Persons not to possess, use, manufacture, control, sell or transfer firearms.

79. This failure to list the crime upon which the search was based is not fatal to the warrant; *see Summage, infra.*

80. However, since no firearm or other "offensive weapon" was located as a result of executing the search warrant at Government Exhibit 8, the Court need not indulge in an

26

analysis of a substantial basis in the warrant for firearms.

81.  Finally, with the redaction of the reference to marijuana, the only evidence remaining within the affidavit of probable cause that relates to controlled substances and their use or distribution is that the Defendant associated with Willie Gulley, an individual who at the time of the search was under indictment in this Court "for conspiracy to distribute 50 grams or more of cocaine base" and that the Defendant was convicted "for delivery / PWID on December 11, 1998"; these two circumstances alone clearly do not establish probable cause to search for any controlled substances or related paraphernalia for use or distribution of those substances and other related matters including "Cellular phones and their digital contents", "'owe' sheets [and] financial records."

82.  Therefore, the remaining items sought to be searched for and seized are related to evidence related to the simple assault, but the Defendant disputes that probable cause exists within the affidavit of probable to even search for such matter. Document No. 82, p. 31 ¶ 75.

83.  "[A]n affidavit must contain the factual basis for the finding of probable cause, not merely 'the unsupported assertion or belief of the officer.'" *United States v. Bush*, 647 F.2d 357, 362 (3d Cir. 1981)(citations omitted).

84.  While it is true that there were no facts alleged to support the probable cause that "photographs of the scene, blood, hair, trace evidence, evidence of breakage" were present at 202 Hickory, these listed items were not exclusive to other evidence and indeed they were prefaced by the phrase: "Evidence of domestic violence to include:".

85.  Although the affidavits of probable cause did not provide a factual basis to assume such items existed, the statements of Paul did provide facts that establish probable cause to search for "Evidence of domestic violence".[15]

86.  The police officers also read correspondence within 202 Hickory that the Defendant claims exceeded the scope of the search warrant. Document No. 82, p. 31 ¶ 84.

87.  While it is clear that the search warrant did not explicitly permit the reading of correspondence, the search warrant did permit a search for proof of residency as well as evidence related to domestic violence; although the letters were not admitted as exhibits before this Court, it is only logical for the police searching the residence to review open correspondence for any indication of an address and the person it was

---

[15]One obvious item not explicitly listed in the items to be searched for that would corroborate Paul's story was the t-shirt that was the subject of the argument.

addressed to or if it was correspondence addressed between Paul and the Defendant that concerned domestic violence.

88. Therefore, the Court finds that there was probable cause to search already open correspondence within 202 Hickory in order to determine proof of residency or find evidence of the simple assault of Paul and if in the process of reading such correspondence, the police officers viewed matters in furtherance of executing the search warrant and if the revelation of other incriminating matters unrelated to the search warrant occurred while reading the correspondence, the police were justified in seizing such correspondence if the incriminating nature was apparent from its contents. *See United States v. Menon, supra.*

89. Additionally, the police officers were properly within 202 Hickory executing the search warrant for evidence of simple assault when they recovered the 9mm casing and the 9mm live hollowpoint cartridge along with various other items of controlled substances paraphernalia. *See* Government Exhibit 8, Receipt/Inventory pages.

90. Proceeding to the second search warrant set forth in Government Exhibit 9, Haymaker as the affiant on this warrant has the benefit of not only Madden's comments regarding the Defendant's possession of a firearm, but the recovery of a 9mm casing and a live 9mm live hollowpoint cartridge from within 202 Hickory that establishes a substantial basis to support the magistrate's conclusion that probable cause existed to believe a firearm was present at 202 Hickory.

91. However, Government Exhibit 9 mimics the affidavit of probable cause within Government Exhibit 8 except for the additions of the two paragraph 13s, and the addition of "safes, strong boxes and their contents; ammunition (spent and live); all correspondence between Willie Gene Gulley, Jr., and Tyrone Williams" to the list of "[i]tems to be searched and seized."

92. In mimicking the list of items to be searched for and seized in Government Exhibit 8, Government Exhibit 9 references "Taser / stun gun or similar weapon; Any firearms or other prohibited weapons" but only references 18 Pa.C.S.A. § 908.1 (the statute that prohibits, inter alia, possession of taser / stun guns by certain convicted felons by referencing 18 Pa.C.S.A. § 6105) and not 18 Pa.C.S.A. § 6105 (the statute prohibiting certain persons, including certain convicted felons from possessing firearms) as the violation upon which the warrant is based.

93. The failure to set forth within a search warrant the crime for which the search warrant is based is not fatal to establishing probable cause so long as the warrant presents probable cause that criminal acts occurred. *See United States v. Summage*, 481 F.3d

1075, 1078-1079 (8th Cir. 2007).

94.     Despite its failure to reference the statute which forms the basis for the seizure of the firearm, the application for the search warrant indicates that it permits a search for "firearms" and the affidavit of probable cause establishes that one person indicated the Defendant possessed a firearm, and evidence of spent and live ammunition was recovered in the first search along with photographs of the Defendant "posing with guns." Government Exhibit 9, p. 6.

95.     These observations within the affidavit of probable cause attached to the application for a search warrant seeking, *inter alia*, "firearms" is sufficient to establish probable cause for a violation of 18 Pa.C.S.A. § 6105 when read in conjunction with the allegation in the affidavit of probable cause that the Defendant was convicted of "delivery/PWID on December 11, 1998".

96.     As to probable cause, police officers need not muster evidence that would be necessary to convict a defendant: "it is clear that 'only the probability, and not a prima facie showing, of criminal activity is the standard of probable cause.'" *Illinois v. Gates*, 462 U.S. 213, 235, 103 S.Ct. 2317, 2330, 76 L.Ed.2d 527, 546 (1983)(citation omitted); *see also United States v. Brown*, 33 Fed. Appx. 606, 608(3d Cir. 2002)(citing *Gates*).

97.     Haymaker's reference to "delivery/PWID" within the affidavit did not indicate the level of punishment possible for the Defendant's prior conviction on this offense; however, the Court finds that such an understanding is only critical to proving a *prima facie* violation of 18 Pa.C.S.A. § 6105(c)(2) as only offenses that may result in terms of imprisonment exceeding two years result in the disability against possessing firearms and therefore, the Court does not find this lack of detail fatal to establishing *probable cause*.

98.     Additionally, Haymaker's allegation within the affidavit regarding "delivery/PWID" does not indicate what article or substance was delivered or intended to be delivered, which is integral to establishing the amount of punishment.

99.     The absence of identifying the article or substance that was the subject of that conviction does not prevent the Court from concluding that there is a substantial basis for the magistrate's determination of probable cause because the Court finds it sufficient for an affiant to a search warrant application to identify conviction under 18 Pa.C.S.A. § 6105 subsection (c)(2) from which the magistrate can conclude that there exists a probability that a crime is or was being committed.

100. In comparison, this Court's recent decision in *United States v. Jones*, Criminal No. 3:2007-21, 2008 WL 3926549 at \*12-16 (W.D.Pa. August 27, 2008) found, *inter alia*, that Detective Haymaker's allegation in the affidavit of probable cause in that matter failed to reveal a substantial basis for this Court to uphold the magistrate's findings of probable cause as to a search warrant based upon a violation of 18 Pa.C.S.A. § 6105 subsections (a)(1), (b) and/or (c) when he relied upon the predicate conviction that Jones was "a convicted felon from New Jersey".

101. Haymaker's allegation in *Jones* did not permit the magistrate to establish any type of probability that 18 Pa.C.S.A. § 6105(a)(1) (based upon a v iolation set forth in subsections (b) or (c)) was violated or that evidence of that crime existed because the Pennsylvania statute prohibits the possession of firearms by persons convicted of enumerated offenses under the Pennsylvania Crimes Code or "any offense equivalent to any of the above-enumerated offenses under the statutes of any other state...."

102. In *Jones*, without naming the felony conviction from a state other than Pennsylvania, there could have been no basis for the magistrate to compare that felony conviction with his knowledge of the offenses set forth 18 Pa.C.S.A. § 6105(b) that establish a disability to possess firearms.[16]

103. Unlike the *Jones* affidavit, the present affidavit of probable cause identifies a conviction under which 18 Pa.C.S.A. § 6105 (c)(2) imposes a disability from possessing a firearm, if the conviction is "punishable by a term of imprisonment exceeding two years" pursuant to "[t]he Controlled Substance, Drug, Device and Cosmetic Act".

104. Although Haymaker's affidavit of probable cause in the case *sub judice* does not establish a *prima facie* case of criminality in that it failed to establish the possible punishment of such a conviction, it did present the magistrate with the ability to determine if the Defendant's actions create a probability that a violation of 18 Pa.C.S.A. § 6105 occurred because it named a predicate offense addressed by that statute and to evaluate if evidence of that crime existed in the place to be searched.

---

[16]Furthermore, potentially identifying a predicate conviction as a "Pennsylvania felony" provides no more probability that 18 Pa.C.S.A. § 6105 was violated than indicating one was convicted of a felony in New Jersey. Such a general description of the grading of the offense would only work to establish probable cause under a statute that prohibited individuals from possessing firearms based upon any felony conviction. Thus, a description of only the grading of the offense of conviction (e.g misdemeanor or felony) and not the name of the offense of conviction does not increase or decrease the probability that a crime was committed that falls within the scope of 18 Pa.C.S.A. § 6105 in light of that statute's identification of specific offenses and circumstances that establish a basis to prohibit possession of a firearm .

105. To require the search warrant at Government Exhibit 9 to set forth the specific item or substance that was possessed and delivered or otherwise explicitly name the grading of the offense would have required a *prima facie* showing of the elements of a violation of 18 Pa.C.S.A. § 6105(c)(2) and that exceeds what this Court finds is required for establishing probable cause.[17]

106. Thus, the Court concludes that a substantial basis existed for the magistrate's finding of probable cause within the search warrant at Government Exhibit 9 by the fact that Haymaker listed a criminal offense encompassed by 18 Pa.C.S.A. § 6105(c)(2) despite not naming the grade assigned to the offense nor by naming the item possessed and delivered more explicitly.

107. The Court adopts the same analysis and ruling with respect to probable cause search for a "Taser / stun gun or similar weapon" and any controlled substances or related paraphernalia for use or distribution of those substances and other related matters including "Cellular phones and their digital contents", "'owe' sheets [and] financial records"at Government Exhibit 9 as it did in Government Exhibit 8 and therefore, that portion of the warrant authorizing the search for such is stricken as being overbroad for its lack of probable cause as to those items.

---

[17]18 Pa.C.S.A. § 6105 is an offense that presents unique quandaries when evaluating the presence of probable cause. Some of the convictions establishing the disability prohibiting firearm possession require proof of more than one conviction of that offense, or convictions that may result in a specific length of imprisonment (such as the present case) or convictions of a certain grading (*e.g.* second degree felony conviction). Added to these circumstances is the possibility of removal of the disability by order of the Court of Common Pleas based upon such conditions as a vacation of the previous conviction or a pardon by the Governor. The Court believes that to require a police officer to establish such specificity within the warrant or conduct an investigation into the status of such proceedings prior to applying for an arrest or search warrant is needless to say, burdensome and unnecessary at such a preliminary stage of an investigation. While more detail and specificity if known can only help establish the presence or absence of probable cause, it clear that the police officers need not present evidence sufficient for a conviction in order to obtain approval of a warrant application.

Therefore, the Court finds, in instances where a charge pursuant to 18 Pa.C.S.A. § 6105 is based upon a previous conviction for an offense enumerated in subsection (c)(2) of that section, the name of the conviction offense is critical to establishing probable cause. Although the Court does not have before it issues regarding all of the possible additional requirements for certain convictions of the enumerated offenses in § 6105, such as the grading of the offense, the number of times of conviction or the level of punishment possible for the conviction entered, the Court is presented with the issue of whether the "delivery/PWID" offense is one that qualifies as a conviction under 18 Pa.C.S.A. § 6105 subsection (c)(2) because the level of punishment received is not stated by Haymaker. The Court believes that this is not fatal to the magistrate's finding of probable cause as a substantial basis exists for that conclusion. It is possible that conviction is one that did not carry a possible term of imprisonment in excess of two years, but such detail can be investigated and proven by the district attorney when the case proceeds to trial. Therefore, police officers in order to establish probable cause need not state with a warrant application the level of possible incarceration for an offense under 18 Pa.C.S.A. § 6105(c)(2) as long as the name of the offense is encompassed by "The Controlled Substance, Drug, Device and Cosmetic Act, or any equivalent Federal statute or equivalent statute of any other state...." 18 Pa.C.S.A. § 6105(c)(2).

31

108. Similarly, the Court maintains the same analysis for Government Exhibit 9 as it did for Government Exhibit 8 as to evidence of domestic violence as probable cause existed for to search for such items. *See* Conclusions of Law 84-85.

109. The police officers' plain view of the correspondence, the spent and live ammunition and the photographs revealed in the first search pursuant to a warrant presents a substantial basis for the magistrate's approval of the second search warrant application for such items as well as firearms.

110. Lastly, the Court must turn its attention to the application of the "good faith" doctrine regarding any evidence that must be suppressed for the lack of substantial basis as to probable cause for such items.

111. First, the stun gun and the marijuana were both seized during the warrantless entry of 202 Hickory when the police officers conditioned Paul's entry to obtain her infant's necessities upon her search for and surrender of the stun gun; the marijuana was recognized and seized by Haymaker upon his entry into the living room of 202 Hickory prior to Paul locating and surrendering the stun gun to Keim.

112. This warrantless entry, as stated above, could be considered a search without the permission of a present and objecting co-inhabitant or an unreasonable seizure that exceeded the law enforcement's need to preserve evidence-in either instance it resulted in seizures of two illegal items in violation of the Fourth Amendment. *See* Conclusion of Law 53.

113.[18] The Supreme Court in *United States v. Leon*, 468 U.S. 897, 922-923, 104 S.Ct. 3405, 3420-3421, 82 L.Ed.2d 677, 698-699 (1984) provided for the creation of the "good faith" exception to the exclusionary rule by permitting introduction of evidence otherwise obtained by law enforcement in violation of the Fourth Amendment when the evidence was obtained pursuant to a search warrant for which law enforcement had "objectively" "reasonable grounds" to conclude was legally sufficient.

114. "The test for whether the good faith exception applies is 'whether a reasonably well trained officer would have known that the search was illegal despite the magistrate [judge's] authorization.'" *U.S. v. Hodge*, 246 F.3d 301, 307 (3d Cir. 2001).

115. Typically, issuance of the search warrant presents the existence of good faith for the police officer executing the search. *Id.*

---

[18]Conclusions of Law 113 through 115 are direct quotes from the Court's opinion in *United States v. Jones*, Criminal No. 3:2007-21, 2008 WL 3926549 at * 18 (W.D.Pa. August 27, 2008), Conclusions of Law 77 through 79.

116. It has been recognized that the good faith exception does not apply to instances where a warrantless search was conducted without probable cause and our sister District Court in New Jersey has previously addressed this issue:

> *Leon* addressed situations in which a search warrant, subsequent to its execution, is found to have been lacking in probable cause due to an improper assessment by the issuing magistrate. *Id.* at 900, 104 S.Ct. at 3409. Therefore, *Leon* did not address the situation presented here, where the information upon which the search warrant was based was itself the product of an illegal, warrantless search by a police officer. Nor is there any indication that the *Leon* court intended that the good faith exception would extend to this situation. The Supreme Court recognized that the purpose of the exclusionary rule is to deter future police misconduct. *Id.* at 906, 104 S.Ct. at 3411. The good faith exception therefore operates in certain situations where the exclusion of evidence would not serve to deter police misconduct. *Id.* at 922, 104 S.Ct. at 3420. As the Supreme Court observed, in most cases where a magistrate improperly determines that probable cause justifies the issuance of a warrant, "there is no police illegality and thus nothing to deter." *Id.* at 921, 104 S.Ct. at 3419.
>
> In contrast, here we are presented with a detective who has conducted an illegal search and thereby secured the information upon which the magistrate's probable cause determination was based. Therefore, the goal of deterring future illegal searches by officers supports the application of the exclusionary rule in this case.

*United States v. Villard*, 678 F.Supp. 483, 491-492 (D.N.J. 1988).

117. Indeed this Court is presented with the same legal issue under a different criminal charge: Haymaker and Keim obtained evidence in violation of the Fourth Amendment and that evidence was the basis for the first search warrant application that was subsequently issued as a warrant. See Government Exhibit 8.

118. The Court adopts the *Villard* analysis in concluding that Haymaker's inclusion of the fact that the stun gun and the marijuana were seized into both affidavits of probable cause found in Government Exhibits 8 and 9 does not exorcize the ghost of the exclusionary rule and the dictates of the Fourth Amendment.

119. *Leon* as applied in the *Villard* analysis establishes that the fruits of illegal warrantless searches and warrantless searches generally were not part of the consideration is the

33

establishment of the "good faith" doctrine; the issuance of a warrant by a magistrate was the first step in establishing that good faith and should law enforcement be permitted to sanctify any illegal seizures by including them as a basis in a later-issued warrant, such an approach would entirely destroy the purpose and existence of the exclusionary rule.

121. Therefore, the stun gun surrendered by Paul to Keim and the marijuana seized by Haymaker during the warrantless search and/or seizure into 202 Hickory must be suppressed as the good faith exception is inapplicable as to these two pieces of evidence.

## CONCLUSION

The Court will suppress the marijuana seized by Haymaker and the stun gun surrendered by Paul to Keim. These two items shall not be admissible in the government's case-in-chief at trial and the good faith exception to the exclusionary rule does not operate to prevent their exclusion. The firearm along with the remaining evidence seized after execution of the search warrants are admissible at trial.

**AND NOW,** this 2nd day of September, 2008, in accordance with the foregoing Memorandum Opinion after consideration of the Defendant's Motion to Suppress Evidence with Citation of Authority (Document No. 31), IT IS HEREBY ORDERED THAT the motion is GRANTED IN PART as to the marijuana and the stun gun seized by Patrolmen Haymaker and Keim upon their warrantless entry into 202 Hickory Street and DENIED IN PART as to the remainder of the evidence seized pursuant to the two search warrants executed upon 202 Hickory Street thereafter on the night of August 14-15, 2005.

**BY THE COURT:**

**KIM R. GIBSON,**
**UNITED STATES DISTRICT JUDGE**

35